UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TSHOMBE M. KELLEY,<br><br>Plaintiff,<br><br>v.<br><br>A. HERRERA, et al.,<br><br>Defendants. | No. 2:16-cv-01894 JAM CKD P<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a California prisoner proceeding pro se with an action for violation of his civil rights pursuant to 42 U.S.C. § 1983. This action proceeds on the complaint filed August 11, 2016 alleging that five correctional officers at California State Prison-Sacramento[1] used excessive force against him in violation of the Eighth Amendment. Currently pending before the court is plaintiff's partial motion for summary judgment filed on September 25, 2017, ECF No. 30, and defendants' December 1, 2017 motion for summary judgment, ECF No. 37. These motions have been fully briefed by the parties. See ECF Nos. 40, 42, 48. For the reasons discussed below, the undersigned recommends that plaintiff's motion be denied and defendants' motion for summary judgment be granted.

/////

---

[1] Hereinafter referred to as "CSP-Sac."

1

**I.      Summary Judgment Standards Under Rule 56**

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or show that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

**II.     Facts[2]**

On February 27, 2015, while an inmate at CSP-Sac, plaintiff walked off the C-Facility's Main Exercise Yard and stopped on the concrete walkway in front of the C-Facility Watch Office in an effort to speak to the facility captain about confiscated property. See ECF No. 1 at 2; ECF No. 37-5 at 1-2.[3] Defendant Baker then approached plaintiff and informed him that he could not speak to the captain at that time and that plaintiff needed to return to the concrete track. ECF Nos. 30 at 4-5 (Plaintiff's Declaration at ¶ 2-3); 37-5 at ¶ 3 (Baker Declaration). Plaintiff does not acknowledge being told to return to the track. ECF No. 30 at ¶ 3.

---

[2] All facts are undisputed unless otherwise indicated.
[3] The court notes that when a complaint is verified under penalty of perjury, it has the effect of an affidavit to oppose summary judgment "to the extent it is 'based on personal knowledge' and 'sets forth specific facts admissible in evidence.'" Keenan v. Hall, 83 F.3d 1083, 1090 n. 1 (9th Cir. 1996).

3

Five other inmates walked off the concrete exercise track and towards the area where plaintiff was standing. ECF No. 37-5 at ¶ 3; ECF No. 39 (Camera 11-0184 at 12:47:24) (DVD from CSP-Sac).[4] Defendants Baker and Herrera gave these inmates a verbal order to return to the track. ECF Nos. 37-5 at ¶ 3; 37-7 at ¶ 3; 37-8 at ¶ 4. Three of the assembled inmates then walked away from plaintiff and back towards the concrete track. ECF No. 39 (Camera 11-0184 at 12:47:29). Defendant Baker then ordered the central tower to put the yard down. ECF Nos. 37-5 at ¶ 3; 37-7 at ¶ 4. Every C-Yard prisoner sat down on the ground in response, including three of the inmates who had previously assembled near plaintiff. ECF Nos. 37-5 at ¶ 3; 37-7 at ¶ 4; ECF No. 39 (Camera 11-0184 at 12:47:30-12:47-39).

Plaintiff, Inmate Baddie, and Inmate Craig all remained standing despite repeated orders to get down. ECF Nos. 37-5 at ¶ 3; 37-7 at ¶ 4; ECF No. 39 (Camera 11-0184 at 12:47:30-12:47-39). At this point in time, four correctional officers including Defendant Baker, had approached plaintiff and the two other inmates who remained standing. ECF No. 39, Camera 11-0184 at 12:47:33. Defendant Baker and another correctional officer placed their hands on Inmate Baddie and escorted him off of the yard without incident. ECF Nos. 30 at ¶4; 37-5 at ¶ 4; ECF No. 39 (Camera 11-0184 at 12:47:37). Inmate Baddie was removed off the yard in order to de-escalate the situation and to reduce the potential number of inmate attackers. ECF No. 37-5 at ¶ 4.

**A. Defendant Herrera's Use of Pepper Spray**

Defendant Herrera, who was one of the correctional officers who had approached plaintiff's location, noticed that Inmate Craig, who had previously been standing with his arms crossed over his chest, dropped his hands to his side. ECF No. 37-8 at ¶ 6. Defendant Herrera also observed Inmate Craig clench his fists, although the videotape footage from the yard does not corroborate this due to its distance from the incident. Compare ECF No. 37-3 at ¶ 9 with ECF No. 39 (Camera 11-0184 at 12:47:36-12:47:39). In fear that plaintiff and Inmate Craig were going to physically attack correctional staff and in order to gain compliance with orders to get down on the

---

[4] Defendants lodged the video footage from two separate cameras monitoring the exercise yard on a single DVD. ECF No. 39. The court has viewed both videos, but cites only to Camera 11-0184 as it zoomed in on plaintiff while he was being handcuffed and placed on a rolling gurney and is therefore the most relevant.

4

ground, defendant Herrera first sprayed Inmate Craig in the facial area with Oleoresin Capsicum (OC) Spray from an approximate distance of eight to ten feet and then he sprayed plaintiff in the face from approximately six feet away. ECF Nos. 30 at ¶ 5; 37-8 at ¶ 7; ECF No. 39 (Camera 11-0184 at 12:47:40). Plaintiff immediately turned to walk away from the correctional officers, but still did not get down on the ground as ordered by defendant Herrera. ECF Nos. 30 at ¶ 6; 37-7 at ¶ 5; 37-8 at ¶ 7; ECF No. 39 (Camera 11-0184 at 12:47:43). Inmate Craig got down on the ground. ECF No. 39 (Camera 11-0184 at 12:47:40). Defendant Herrera "feared that inmate Craig would get back up and attempt to assault staff," so he sprayed him a second time in the facial area from a distance of eight to ten feet away. ECF Nos. 37-8 at ¶ 7; No. 39 (Camera 11-0184 at 12:47:42-43). Inmate Craig turned back towards the ground and did not get up. Id. Plaintiff remained on his feet leading defendant Herrera to believe that the first blast of OC spray had no effect on him and that plaintiff would turn around and attack staff. ECF No. 37-8 at ¶ 8. Defendant Herrera then sprayed plaintiff a second time with OC spray as he was walking away towards the track. ECF Nos. 37-7 at ¶ 5; 37-8 at ¶ 8; 39 (Camera 11-0184 at 12:47:46). Plaintiff still refused to get down and continued walking towards the C-Yard field. Id. He then sat down on the grassy field facing 7 correctional officers while still refusing orders to prone out on his stomach. ECF Nos. 30 at ¶ 6; 37-8 at ¶ 8, 10; 39 (Camera 11-0184 at 12:48:00).

**B. Defendant Herrera's Use of Force for Handcuffing Plaintiff**

While sitting on the edge of the field, plaintiff acknowledges "exchang[ing] words" with the correctional officers. ECF No. 30 at ¶ 7. According to defendants Haring and Herrera, plaintiff was "yelling profanities at correctional staff and appeared to be inciting other inmates on the yard to use violence against staff." ECF Nos. 37-7 at ¶ 6 (indicating that plaintiff yelled "You guys going to let them do this to me?"); 37-8 at ¶ 10.

Defendant Haring formed a "skirmish line" of several correctional officers including defendants Herrera and Thorell in order to retrieve plaintiff from the field and place him in handcuffs. ECF Nos. 37-7 at ¶7; 37-10 at ¶ 3. During this time, plaintiff stood up, walked farther away from the officers on the grassy field, and used his shirt to wipe away pepper spray from his face. ECF No. 39 (Camera 11-0184 at 12:48:08; 12:51:17-21). Other inmates were

5

ordered to move away from plaintiff or were handcuffed in order to clear a path of travel for correctional officers to safely approach plaintiff. ECF Nos. 37-7 at ¶ 8; 39 (Camera 11-0184 at 12:51:13-12:51:40).

Defendant Haring supervised the arrest team who advanced towards plaintiff while ordering him to lay prone on his stomach. ECF Nos. 37-6 at ¶ 8; 37-7 at ¶ 9; 37-8 at ¶ 11; 37-10 at ¶ 4; 39 (Camera 11-0184 at 12:53:16). Plaintiff refused and remained sitting up on the grassy field facing the arrest team. Id. Less than thirty seconds after starting their approach towards plaintiff, the arrest team forced plaintiff onto his side in an effort to put handcuffs on him. ECF No. 39 (Camera 11-0184 at 12:53:25-12:53:27); ECF No. 30 at ¶ (Plaintiff's declaration indicating that "officers twisted my torso stomach first towards the ground."). Plaintiff resisted the efforts of the officers to place him in handcuffs by "keeping his hands under his stomach, twisting his body from side to side, and inadvertently spitting in the direction of staff." ECF Nos. 37-8 at ¶ 12; 37-7 at ¶ 9; 37-10 at ¶ 4; 37-10 at ¶4; 39 (Camera 11-0184 at 12:53:43) (showing plaintiff on his side with his right hand still free).

From his vantage point behind the skirmish line, defendant Engellenner heard plaintiff tell other inmates, "Come on guys get them," "Get them," as well as "I can't breathe." ECF No. 37-6 at ¶ 9; ECF No. 30 at 24. Defendant Engellenner then focused his attention on the other inmates on the yard to make sure that they did not respond to plaintiff's statements. ECF No. 37-6 at ¶ 9.

Defendant Herrera then placed his right knee on plaintiff's left shoulder blade to keep plaintiff from twisting his body from side to side while other officers attempted to get plaintiff's hands behind his back. ECF No. 37-8 at ¶ 8; 37-7 at ¶ 9; 37-10 at ¶ 4. Defendant Thorell was ultimately able to handcuff plaintiff with the assistance of two other correctional officers who are not defendants in this action. ECF No. 37-10 at ¶ 5. The officers then rolled plaintiff onto his stomach. ECF No. 39 (Camera 11-0184 at 12:54:26).

Plaintiff continued to resist by kicking his legs which prompted officers to use leg restraints. ECF Nos. 37-3 at ¶¶ 27-28; 39 (Camera 11-0184 at 12:54:30-12:54:51). Based on plaintiff's continued resistance, Defendant Haring requested a spit mask and a rolling gurney to remove plaintiff from the exercise yard. ECF Nos. 37-7 at ¶ 10.

### C. Defendant Thorell's Placement of a Spit Mask

Defendant Thorell placed a spit mask over plaintiff's head less than two minutes after the arrest team first made physical contact with plaintiff. ECF Nos. 37-3 at ¶ 29; 37-10 at ¶ 6; 39 (Camera 11-0184 at 12:55:12). The spit mask consisted of a see-through cotton mesh fabric that was placed over plaintiff's head like a hood, but still allowed him to see and breathe. ECF No. 37-10 at ¶ 6. Plaintiff asserts that the spit mask was improperly applied and restricted his breathing to the point where he lost consciousness. ECF No. 30 at ¶¶ 11-13. According to plaintiff, he did not regain consciousness until he was moved to the medical section of C-Facility. Id. at ¶13.

Yard camera footage demonstrates that plaintiff's head was resting on his left cheek and was not face down from the time the spit mask was applied until he was rolled onto his back. ECF No. 39 at 12:55:12-12:55:57. Additionally, after the spit mask was applied, plaintiff continued to kick his legs (ECF No. 39, Camera 11-0184 at 12:55:21-30); lift his head while arching his body backward (ECF No. 39, Camera 11-0184 at 12:55:20), and lift his head off the rolling gurney (ECF No. 39, Camera 11 at 12:56:33-34).

Multiple correctional officers then rolled plaintiff from his stomach onto his back on the stokes litter. ECF No. 39 (Camera 11-0184 at 12:55:57). Videotape footage shows plaintiff attempting to roll off the stokes litter back onto his stomach before the stokes litter is lifted onto the rolling gurney. ECF No. 39 (Camera 11-0184 at 12:55:58-12:56:02 (plaintiff's movements on the stokes litter); 12:56:29-12:56-32 (stokes litter lifted onto the rolling gurney). Multiple correctional officers heard plaintiff continuing to yell at correctional staff as he was escorted to the medical clinic on the rolling gurney. ECF Nos. 37-5 at ¶ 7; 37-6 at ¶ 10; 37-7 at ¶ 11

Defendants Baker, Engellener and Haring did not use any type of force against plaintiff during the events of February 17, 2015. ECF Nos. 37-5 at ¶8; 37-6 at ¶ 10; 37-7 at ¶¶ 8-11.

////
////
////
////

7

**D. Plaintiff's Injuries**

The residual OC spray wore off four to five days after the incident when plaintiff started sweating while cleaning his cell. ECF No. 38 at 54 (Plaintiff's Deposition).[5] After that, it never bothered plaintiff again. Id. He also received cuts on his arms and wrist from the handcuffs which plaintiff admitted "is pretty normal in a situation like that." ECF No. 37-4 at 8 (Plaintiff's Deposition). He also has a scar on his left arm. Id.

**III. Legal Standards**

**A. Excessive Force Claims**

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. To determine whether the defendant's use of force was malicious and sadistic, the Hudson Court laid out five factors derived from Whitley v. Albers, 475 U.S. 312 (1986), for courts to consider: (1) the extent of injury suffered by an inmate, (2) the need for application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7, 112 S. Ct. 995 (citing Whitley, 475 U.S. at 321). In weighing these factors, "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard ... the case should not go to the jury." See Whitley, 475 U.S. at 322.

**B. Failure to Protect Claims**

A prison official may be liable under 42 U.S.C. § 1983 if he is aware that a fellow officer is violating a prisoner's constitutional rights but fails to intervene. Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir.2000) ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."); see also Gaudreault v. Municipality of Salem, 923 F.2d, 203, 207 n. 3 (1st Cir.1990) ("An officer who is present at the

---

[5] The deposition was lodged in paper format with the court. ECF No. 38. Therefore, the pagination refers to the paper copy rather than to the electronic pagination on the court's docket.

8

scene who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance."). The failure to intervene can support an excessive force claim where the bystander-officers had a realistic opportunity to intervene but failed to do so. Lolli v. County of Orange, 351 F.3d 410, 418 (9th Cir. 2003); Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000); Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).

### C. Supervisory Liability

For purposes of 42 U.S.C. § 1983, "supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013); Hansen v. Black, 885 F.2d 642, 645–46 (9th Cir. 1989). "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Crowley, 734 F.3d at 977; Hansen, 885 F.2d at 646. A sufficient causal connection between a supervisor's conduct and a constitutional violation can be shown when: (1) the supervisor sets in motion a series of acts by others, or knowingly refuses to terminate a series of acts by others, that the supervisor knew or reasonably should know will cause others to inflict a constitutional injury; (2) the supervisor's own culpable action or inaction in the training, supervision, or control of his subordinates; (3) the supervisor's acquiescence in or ratification/condoning of the constitutional deprivation; or (4) conduct by the supervisor that showed a reckless or callous indifference to the rights of others. See Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011); Dubner v. City & Cnty. of San Francisco, 266 F.3d 959, 968–969 (9th Cir. 2001); Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998); Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

### D. Qualified Immunity

A court employs a two-step analysis in determining qualified immunity. See Saucier v. Katz, 533 U.S. 194, 200–02 (2001); CarePartners LLC v. Lashway, 545 F.3d 867, 876 n. 6 (9th Cir. 2008). Under the first step, the court determines whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional

9

right." Saucier, 533 U.S. at 201; Bingue v. Prunchak, 512 F.3d 1169, 1173 (9th Cir. 2008). All factual disputes are resolved in favor of the party asserting the injury. See Saucier, 533 U.S. at 201; Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013). If the answer to the question is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis. See Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173. Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202. The critical question is whether "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the right." Saucier, 533 U.S. at 202; Inouye, 504 F.3d at 712. Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173. If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity. See Saucier, 533 U.S. at 205–06; Johnson v. County of L.A., 340 F.3d 787, 794 (9th Cir. 2003).

**IV.     Analysis**

For the sake of judicial economy, the court will address defendants' motion for summary judgment first rather than plaintiff's partial summary judgment motion. There are essentially three applications of force at issue in this case. The first is the use of pepper spray by defendant Herrera. The second is the application of force by defendant Herrera so that other officers could handcuff plaintiff. The third is Thorell's placement of a spit mask on plaintiff after he was pepper sprayed, handcuffed, and lying on his stomach. The court will address the Hudson factors with respect to each application of force.

At the outset, the court finds that defendants have met their initial burden of informing the court of the basis for their motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to plaintiff to establish that a genuine issue as to any material fact actually does in fact exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court has

reviewed plaintiff's verified complaint and his exhibits in opposition to defendants' pending motion. Drawing all reasonable inferences from the evidence submitted in plaintiff's favor, the court concludes that plaintiff has not submitted sufficient evidence at the summary judgment stage to create a genuine issue of material fact with respect to his claim that the defendants violated his rights under the Eighth Amendment for the reasons explained below.

### A. Defendant Herrera's Use of Pepper Spray

The initial use of force in this case was defendant Herrera's application of pepper spray on two separate occasions within seconds of each other. In relationship to the Hudson factors, the court first finds that before any pepper spray was used, two correctional officers tempered the need for a forceful response by escorting Inmate Baddie off of the exercise yard. However, plaintiff and Inmate Craig remained standing despite repeated orders to get down. Defendant Herrera reasonably perceived this non-compliance on an open exercise yard as a threat and deployed his pepper spray on plaintiff and the other inmate to gain their compliance with a direct order. This use of force was successful in obtaining the compliance of Inmate Craig who did sit down on the ground after he was pepper sprayed. As a result, there is a demonstrated relationship between the need for force to obtain compliance and the amount of force used in administering pepper spray. The fifth Hudson factor concerning the extent of plaintiff's injuries also weighs in defendant Herrera's favor because there is no evidence of any significant or lasting injuries as a result of the OC spray. Plaintiff sweated out the residual OC spray several days after the incident. Accordingly, the court finds that all five Hudson factors demonstrate that defendant Herrera's use of the OC spray was done in an effort to restore discipline and was not done in a malicious or sadistic manner. Viewing the evidence in the light most favorable to plaintiff, the allegation that defendant Herrera improperly administered pepper spray does not support a claim for relief under section 1983 for the use of excessive physical force.

### B. Defendant Herrera's Use of Force in Order to Handcuff Plaintiff

The second use of force in this case occurred on the grassy field after the skirmish line approached plaintiff to handcuff him and remove him from the yard. First, the court notes that the correctional officers attempted to temper the use of a forceful response by ordering plaintiff to

prone out. Plaintiff ignored these orders. Viewing the facts in the light most favorable to plaintiff, his admitted refusal to prone out on the field in violation of multiple orders coupled with his verbal hostility towards the correctional officers reasonably caused defendants to view him as a threat and to take physical control of him. Plaintiff argues that his verbal hostility could not have actually resulted in inciting any of the other inmates on the exercise yard to attack the correctional officers because those nearest to him were handcuffed. However, that completely ignores all of the other inmates who were not restrained in the large, open exercise yard. Plaintiff also resisted the efforts of multiple correctional officers to handcuff him. As a result, Defendant Herrera placed his knee on one of plaintiff's shoulders to prevent plaintiff from twisting his body back and forth as other officers attempted to get his hands behind his back. This level of force was commensurate with the level of plaintiff's ongoing resistance. Even after he was handcuffed, plaintiff started kicking his legs which led officers to use leg restraints as well. Plaintiff's resulting injuries were de minimus, especially in light of the number of correctional officers required to secure him in handcuffs and leg restraints. All of these factors lead the undersigned to conclude that defendant Herrera is entitled to summary judgment on plaintiff's Eighth Amendment claim that he used excessive force in restraining plaintiff prior to being handcuffed.

### C. Defendant Thorell's Placement of a Spit Mask on Plaintiff

The last application of force at issue in this case is defendant Thorell's use of a spit mask. The spit mask as well as the rolling gurney were requested by defendant Haring based on plaintiff's non-compliance with direct orders as well as what was viewed as spitting by the officers. These actions were reasonably viewed as a threat by the correctional officers. Plaintiff's contention that the spit mask was improperly applied causing him to lose consciousness until he woke up in the medical section, is not capable of being believed by a reasonable jury in light of the videotape footage of the incident. See Scott v. Harris, 550 U.S. 372, 380 (2007) (emphasizing that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Even without any audio, plaintiff's multiple movements on the videotape

demonstrate that he was not unconscious.  See Scott, 550 U.S. at 380 (rebuking the court of appeals for not viewing "the facts in the light depicted by the videotape" evidence of a high speed police car chase).  Lastly, there is no evidence that plaintiff suffered any injury as a result of the use of a spit mask.  Therefore, there is no genuine Eighth Amendment violation with respect to defendant Thorell's application and placement of the spit mask.  Summary judgment should be granted in favor of defendant Thorell.

Thus, the evidence submitted and the facts taken in the light most favorable to plaintiff show that the defendants did not act maliciously and sadistically for the very purpose of causing him harm.  For these reasons, the undersigned recommends granting defendants' motion for summary judgment.  This recommendation renders it unnecessary to separately resolve plaintiff's partial motion for summary judgment.

As to the remaining defendants, the court finds that separate analysis of the Hudson factors is not necessary because there is no genuine issue of material fact that these defendants ever used any force against plaintiff.  Defendant Baker's motion for summary judgment should be granted since there is absolutely no evidence that he supervised the use of force against plaintiff.  The only argument that plaintiff makes with respect to defendant Baker is that he neglected his supervisory role of the remaining defendants when he removed Inmate Baddie from the exercise yard.  However, this is not sufficient to establish Eighth Amendment liability because there is simply no evidence that defendant Baker directed the formation or subsequent actions of the skirmish line.  Plaintiff's failure to comply with direct orders is what caused defendants Herrera and Thorell to use force.

With respect to plaintiff's claims against defendants Baker, Engellenner, and Haring for failing to protect him from the remaining defendants' actions, the court finds that there can be no liability for failing to protect him when there is no corresponding excessive use of force claim.  Nor is there any evidence to impose liability on these defendants in any supervisory capacity because there is simply no evidence that they condoned, ratified, or acquiesced in any unconstitutional actions committed by either defendant Herrera or Thorell.  Accordingly, the undersigned recommends granting summary judgment for defendants Baker, Engellener, and

Haring.

**D.  Qualified Immunity**

Defendants' motion for summary judgment also contends that they are entitled to qualified immunity.  Applying the two-step analysis of Saucier v. Katz, 533 U.S. 194, 201 (2001), the court concludes that even taken in the light most favorable to the plaintiff, the defendants' conduct did not violate the Eighth Amendment for the reasons explained above.  There is no evidence that the defendants acted maliciously or sadistically for the purpose of causing plaintiff harm.  Accordingly, the undersigned recommends granting defendant's summary judgment on the additional grounds of qualified immunity.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment, ECF No. 37, be granted.
2. Plaintiff's partial motion for summary judgment, ECF No. 30, be denied as moot.
3. The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 17, 2018

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

12/kell1894.msj.docx